# In the United States Court of Federal Claims

No. 12-71C
(Filed: June 26, 2012)
**\*OPINION ORIGINALLY FILED UNDER SEAL ON JUNE 19, 2012\***

| | | |
|---|---|---|
| | ) | |
| BINL, INC., et al., | ) | |
| | ) | Pre-Award Bid Protest; Standing; |
| Plaintiffs, | ) | Prudential Standing; Military Personal |
| | ) | Property Transportation Contract Rate |
| v. | ) | Solicitations; Carmack Amendment, |
| | ) | 49 U.S.C. § 14706; Declaratory and |
| THE UNITED STATES, | ) | Injunctive Relief Awarded |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

*Benjamin J. Lambiotte* and *Richard D. Gluck*, Washington, D.C., for plaintiffs.

*Douglas T. Hoffman*, United States Department of Justice, Washington, D.C., with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Donald E. Kinner*, Assistant Director, for defendant.

## OPINION

**FIRESTONE**, *Judge*.

On February 2, 2012, plaintiffs, seven small transportation service providers ("TSPs" or more generally, "carriers"), filed this pre-award bid protest. Plaintiffs challenge several terms of the rate solicitations issued by the Department of Defense ("DOD") Surface Deployment and Distribution Command ("SDDC"). SDDC rate solicitations are issued annually, and govern the transportation of the personal property (also called "household goods") of military service members and civilian DOD

employees (collectively referred to here as "service members").  Plaintiffs challenge the 2012-2013 rate solicitations, which went into effect on May 15, 2012.

The terms of the challenged rate solicitations provide that a TSP will not collect or require payment of any freight charges for shipments of personal property totally lost or destroyed in transit.  As to shipments lost or destroyed in part, the terms require that a TSP must refund the portion of its freight charges corresponding to the lost or destroyed portion at the time the TSP settles the loss or destruction claim.[1]  The court will collectively refer to these terms as "freight refund terms."

Plaintiffs allege that the freight refund terms are contrary to law and arbitrary and capricious in light of the "full replacement value" liability scheme ("FRV liability"), mandated by Congress under 10 U.S.C. § 2636a (2006 & Supp. III 2009), that now applies to DOD personal property shipping contracts.  Section 2636a and its accompanying regulations require a TSP to pay the full replacement value for loss or destruction of personal property transported under a shipping contract when a service member submits a claim for loss or destruction within nine months of delivery.  10 U.S.C. § 2636a(a); Defense Transportation Regulations 4500.9-R ("DTR") Part IV, App. G, Attach. G6, § A.1.a; AR 10671.[2]  The statute itself does not define "full replacement

---

[1] The freight refund terms do not apply to "damaged" items.  DOD cannot seek freight refunds if an item is only damaged—the item must be lost or destroyed.  Administrative Record ("AR") 11072-73; AR 2909-10.  For items that are damaged but not destroyed, the TSP will either repair the items or pay the service member for the cost of those repairs.  AR 11060; AR 2884.

[2] Section 2636a(a) provides:  "The Secretary of Defense shall include in a contract for the transportation at Government expense of baggage and household effects for members of the armed forces or civilian employees of the Department of Defense (or both) a clause that requires

value."  However, SDDC's regulations define "full replacement value" as "replacement

cost at destination," which includes any shipping charges and sales tax required to replace

the item at its destination.  DTR Part IV, App. G, Attach. G6, § B.3.g; AR 10673.

Section 2636a(b) also provides for an "offset" remedy.  The offset remedy requires a TSP

to deduct the full replacement value of the lost or destroyed property from the amount

owed by the United States to the TSP under the shipping contract if the service member

and the TSP cannot settle a claim.  10 U.S.C. § 2636a(b).[3]

    Plaintiffs argue that SDDC's inclusion of the freight refund terms alongside the

FRV liability scheme violates 10 U.S.C. § 2636a.  Plaintiffs contend that § 2636a

provides a complete remedy for the government and service members for the loss or

destruction of service members' personal property, and that this remedy does not include

the additional freight refund terms established by SDDC.  Plaintiffs argue that paying the

service member for full replacement value at destination, including shipping charges, and

then refunding the original freight charges to the government makes the government and

the service member "more than whole," contrary to the aim of § 2636a and the intent of

Congress.  Plaintiffs also argue that the freight refund terms violate general liability

principles for the interstate shipment of household goods under the Carmack

---

the carrier under the contract to pay the full replacement value for loss or damage to the baggage
or household effects transported under the contract."  10 U.S.C. § 2636a(a).

[3] The full text of § 2636a(b) reads: "In the case of a loss or damage of baggage or household
effects transported under a contract with a carrier that includes a clause described in subsection
(a), the amount equal to the full replacement value for the baggage or household effects shall be
deducted from the amount owed by the United States to the carrier under the contract upon a
failure of the carrier to settle a claim for such loss or total damage within a reasonable time.  The
amount so deducted shall be remitted to the claimant, notwithstanding section 2636 of this title."

Amendment, 49 U.S.C. § 14706 (2006), which plaintiffs assert provides a liability ceiling for the loss or destruction of service members' personal property.  Plaintiffs further assert that the freight refund terms are improper sanctions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 558(b).  Finally, plaintiffs contend that the government's reliance on inapplicable regulations and statutes to justify its decision to include the freight refund terms in the challenged rate solicitations was arbitrary and capricious.

Plaintiffs request declaratory judgment and injunctive relief against SDDC's inclusion of the freight refund terms in the solicitations.  Plaintiffs ask that the court permanently enjoin the government from including or enforcing the freight refund terms set forth in the challenged rate solicitations.

The government argues that plaintiffs lack standing to bring this bid protest because they have not suffered a competitive injury as a result of the inclusion of the freight refund terms in the challenged solicitations, and because they lack prudential standing under 10 U.S.C. § 2636a, which the government asserts was enacted only for the benefit of service members.  Should the court reach the merits of plaintiffs' protest, the government argues that the freight refund terms do not violate any applicable statutes or regulations, and that SDDC adequately justified its decision to include the freight refund terms alongside FRV liability in its decision.  The government seeks judgment in its favor on the administrative record.

For the reasons discussed below, the court holds that plaintiffs possess standing to challenge the rate solicitations.  Therefore, the government's motion to dismiss based on lack of jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal

Claims ("RCFC") is **DENIED**.  The court further finds that the inclusion of the freight refund terms in the challenged solicitations is contrary to law.  Thus, plaintiffs' motion for judgment on the administrative record is **GRANTED**, and the government's cross-motion for judgment on the administrative record is **DENIED**.

## I.     BACKGROUND

Military service often requires service members and their families to move between duty stations.  Under 37 U.S.C.A. § 476 (West 2012), DOD bears the cost of service member moves, including the movement of personal property.[4]  Because of the volume of moves, SDDC establishes uniform terms that govern the contractors that DOD hires to perform the moves.

Each year, SDDC releases new solicitations for the submission of rates for transportation services under these uniform terms, conditions, and rules.  These terms and conditions will apply to a large variety of "lanes" or "channels"—different types of transportation routes—on which TSPs may bid.  The documents that outline the terms for the 2012-2013 DOD moves are the Domestic 400-NG-2012 Tariff ("NG-2012") and the International Tender 2012 ("IT-2012") (collectively referred to as "the solicitations"). AR 2872 (NG-2012); AR 11016 (IT-2012).  Qualified TSP bidders who submit rates during the 2012 bidding period, if successful, will be bound by the terms and conditions set forth, for international movements, in IT-2012, and for domestic movements, in NG-2012.  To be eligible to receive bookings of household goods shipments, TSPs must also

---

[4] Section 476 states in relevant part: "[I]n connection with a change of temporary or permanent station, a member is entitled to transportation (including packing, crating, drayage, temporary storage, and unpacking) of baggage and household effects."

agree to comply with all provisions of the Defense Transportation Regulations ("DTR") "Tender of Service."  See DTR, Part IV, App. B (the 2012 Tender of Service).  The terms of the Tariff or Tender and Tender of Service are incorporated into the contracts, called the bills of lading, for each DOD move.

Plaintiffs challenge several terms in IT-2012 and NG-2012, which went into effect on May 15, 2012.  Specifically, plaintiffs challenge Items 402(a) and (b) of IT-2012 and Items 46A(1) and (2) of NG-2012—the freight refund terms for each solicitation.  These provisions prohibit TSPs from collecting freight charges for lost or destroyed property and mandate that TSPs refund the portion of their freight charges for items lost or destroyed in transit.  Items 402(a) and 46A(1) state that a TSP will "not collect . . . any published [freight] charges . . . when that shipment is totally lost or destroyed in transit." AR 11072 (IT-2012); AR 2909 (NG-2012).  Items 402(b) and 46A(2) state that "[i]n the event that any portion, but less than all, of a shipment . . . is lost or destroyed in transit" a TSP will refund that "portion of its published freight charges . . . corresponding to [that] portion of the shipment which is lost or destroyed in transit."  AR 11072-73 (IT-2012); AR 2909 (NG-2012).[5]

---

[5] Although the processing of claims under FRV liability is governed by the DTR, the solicitations also reference other liability regulations in the freight refund terms.  NG-2012 states that claims for partially lost or destroyed items will be disposed of under 49 C.F.R. Part 375, which governs interstate shipments of household goods for individual consumers.  AR 2909-10. IT-2012 states that claims for partially lost or destroyed shipments will be disposed of under 49 C.F.R. § 1005, which generally governs the claims processing for lost or damaged items transported in interstate and foreign commerce.  AR 11072-73.

The solicitations also reference the government's general administrative offset authority under 31 U.S.C. § 3716 (2006 & Supp. IV 2010), and authorize the government to access the third party electronic payment system and to "generate[] and approve electronic bills (ebills) in lieu of an administrative offset under 31 USC 3716."  AR 2910 (NG-2012); AR 11103 (IT-2012).  The solicitations provide that "[a]pproved ebills paid or collected under this provision . . . shall be treated as an administrative offset for purposes of appeals and refunds."  AR 2910 (NG-2012); AR 11103 (IT-2012).  Plaintiffs contend that this term means that the government can enforce freight refunds by electronically debiting other amounts due to TSPs for movements other than those subject to claims for loss or destruction.  Pls.' Mot. at 5 n.3.

Plaintiffs challenge the freight refund terms and the offset provisions in IT-2012 and NG-2012 as arbitrary, capricious, and contrary to law when used in conjunction with FRV liability.  Plaintiffs base their claim in part on the historic legislative and regulatory standards governing TSP movement of service members' personal property, and how those standards interact with the current FRV liability scheme.  The court now turns to the legislative and regulatory history and the current framework governing TSP liability for lost or destroyed household goods.

A.     **Statutory History and Current Regulatory Framework Governing TSP Liability for DOD Personal Property Moves**

1.     **Old "depreciated value" liability scheme.**

Prior to the mandatory implementation of FRV liability under 10 U.S.C. § 2636a in 2008, rate solicitations for DOD personal property moves limited the liability of TSPs

to a depreciated value of $1.25 multiplied by the weight of an item, unless the service member paid an additional fee, called a "valuation charge," to declare a higher value. <u>See, e.g.</u>, AR 527, 593-94 (Domestic Personal Property Rate Solicitation D-12 for 2007); AR 3784 (International Personal Property Rate Solicitation I-18 for 2007).  For example, if a shipment weighed 10,000 pounds, the liability of a TSP would be limited to $12,500, unless the service member purchased additional coverage options.  Under this "depreciated value" liability standard, a service member often did not receive enough compensation to replace the lost goods at the destination of the move, due to the relatively low value of used household goods.  These pre-2008 solicitations also contained freight refund terms similar to those challenged by plaintiffs.  These terms required TSPs to refund the portion of their freight charges for property partially lost or destroyed, and forbade TSPs from collecting freight charges on totally lost or destroyed shipments.  <u>See</u> AR 535 (Domestic Personal Property Rate Solicitation D-12 for 2007); AR 3788 (International Personal Property Rate Solicitation I-18 for 2007).

Because under the depreciated value standard service members would often receive less than what it cost them to replace the household goods lost or destroyed in shipment, Congress, in the National Defense Authorization Act for Fiscal Year 2004, permitted DOD to require payment to service members pursuant to FRV liability under a program called "Families First."  Pub. L. No. 108-136, § 634, 117 Stat. 1392, 1509 (2003) (codified as amended at 10 U.S.C. § 2636a); <u>see also</u> H.R. Rep. No. 108-354, at 709 (2003) (Conf. Rep.), <u>reprinted in</u> 2004 U.S.C.C.A.N. 1407, 1484.  The "Families First" program encountered delays in its implementation.  Mandatory Provision of Full

Replacement Value Coverage by Department of Defense Personal Property

Transportation Service Providers (TSPs)/Contractors, 71 Fed. Reg. 75,509, 75,509-10

(Dec. 15, 2006).  As a result, three years later, the John Warner National Defense

Authorization Act of 2007 required DOD to begin including FRV liability in all contracts

for personal property moves involving service members.  Pub. L. No. 109-364, § 363,

120 Stat. 2083, 2167 (2006) (codified as an amendment to 10 U.S.C. § 2636a); S. Rep.

No. 109-254, at 335 (2006).  This mandate was codified at 10 U.S.C. § 2636a, to which

the court now turns.

**2.**        **FRV liability scheme under 10 U.S.C. § 2636a.**

**a.**        **10 U.S.C. § 2636a and accompanying regulations.**

10 U.S.C. § 2636a(a) now requires SDDC to include, in personal property

transportation contracts, terms that compel a TSP to pay the full replacement value of

household goods lost or destroyed in transit.  Under the current version of the statute and

the applicable DTR, whether a service member may collect full replacement value

depends on when the service member submits his or her claim for lost or destroyed

household goods.  If a service member submits a claim within nine months of delivery,

the TSP "must be liable for the full, undepreciated replacement value on all lost or

destroyed items."  DTR, Part IV, App. G, Attach. G6, § A.1.a; see AR 10679.  Full

replacement value is defined in the DTR as "the replacement cost at destination" and

"includes any shipping charges and sales tax."  DTR, Part IV, App. G., Attach. G6, §

B.3.g; AR 10673.  FRV liability is not mandatory if a claim is filed after nine months

from the date of delivery.  If a claim is filed after nine months from delivery but within a

-9-

two year limitation period, the service member may receive compensation for the depreciated value of the personal property.  DTR, Part IV, App. G., Attach. G6, § A.1.e; AR 10673.

Claims for loss or destruction of personal property are also subject to certain liability limits.  The DTR provide that when a claim is filed with the TSP within nine months of delivery, the TSP's liability is capped at $5000 per shipment or $4.00 multiplied by the net weight of the shipment, whichever is greater, but not to exceed $50,000.  DTR, Part IV, App. G, Attach. G6, § B.2.b; AR 10671.  If a claim is filed after nine months but within two years of delivery, the claim is capped under the depreciated value calculation of $1.25 multiplied by the net weight of the shipment.  DTR, Part IV, App. G., Attach. G6, § B.2.c; AR 10671.

If a TSP does not settle a service member's timely filed claim for full replacement value, 10 U.S.C. § 2636a(b) provides for an offset remedy.  In that case, "the amount equal to the full replacement value for the baggage or household effects shall be deducted from the amount owed by the United States to the [TSP]."  Id.  The offset amount is remitted to the service member under this provision.  Id.; see DTR, Part IV, App. G, Attach. G6, § A.1.a.

The challenged solicitations contain FRV liability provisions consistent with the statute and the DTR.  AR 2883-85 (NG-2012); AR 11060-62 (IT-2012).  As noted above, the challenged solicitations also contain freight refund terms.  AR 11072-73 (IT-2012); AR 2909-10 (NG-2012).  In this case, plaintiffs allege that 10 U.S.C. § 2636a(a) and (b) provide the exclusive remedy against TSPs for lost or destroyed personal property.

Therefore, plaintiffs allege, SDDC should have revised its rate solicitations to exclude freight refund terms in light of this comprehensive scheme.  Plaintiffs base their argument, in part, on the legislative history of 10 U.S.C. § 2636a, to which the court now turns.

### b.   Legislative history.

The legislative history surrounding the initial enactment of § 2636a reflects Congress's consideration of both service members and industry in deciding to impose FRV liability.  The House Report accompanying the National Defense Authorization Act for Fiscal Year 2004—the act that initially authorized FRV liability—provides in relevant part:

> The conferees understand that the Department of Defense intends to implement changes to claims procedures, including use of the full replacement value standard, as part of more comprehensive changes under the "Families First" Program.  The conferees fully support implementation of the various aspects of the "Families First" program, including use of customer surveys, increased direct deliveries through customer to carrier contact, and the on-line claims filing processing.  *Additionally, the conferees expect that the full replacement value standard for loss or damage will be implemented in a manner that is consistent with commercial practices* and that is fully explained to military members who should benefit from this new approach.

> The conferees recognize that a reasonable time period should be established in which a servicemember's claim should be resolved before the services exercise their prerogative to make deductions from the amount owed to the carrier by the United States.  The conferees support adoption of industry recommendations wherever feasible, and expect the Department to adopt a reasonable time period to resolve claims, ideally no less than sixty days, as part of its implementation of full value replacement.  The conferees urge the Department to continue working closely with industry representatives to resolve open issues prior to implementation and intend to monitor both the implementation of "full replacement value" and the "Families First" Program and assess the overall costs of the program and the impact of these initiatives on small businesses and quality of life of military members and their families.

H.R. Rep. No. 108-394, at 709-10 (2003) (Conf. Rep.), <u>reprinted in</u> 2004 U.S.C.C.A.N. 1407, 1484-85 (emphasis added).

The legislative history of the National Defense Authorization Act for Fiscal Year 2007, which amended § 2636a to mandate—rather than merely permit—FRV liability, also referenced both service members and industry.  Senate Report No. 109-254, at 335 (2006), addressing the delay in implementing FRV liability, states that "[m]ilitary personnel and their families have waited long enough for realization of the . . . promise of full replacement value for household goods lost and damaged by movers in connection with permanent changes of station."  The conference report addressing the FRV mandate, however, also expresses concern for small businesses:

> [T]he conferees are concerned about potential adverse effects on capable, service-oriented small business movers resulting from the implementation of the full replacement value standard for recovery due to higher costs involved in obtaining liability insurance.  The conferees direct the Secretary of Defense to analyze the potential effects of implementing full replacement value on small businesses and, no later than April 1, 2008, to provide a report to the congressional defense committees on these effects and the Secretary's recommendations for improving small business's ability to compete for Department of Defense-related moves.

H.R. Rep. No. 110-477, at 889 (2007) (Conf. Rep.).

### B.   Revisions to Tenders and Tariffs Under the FRV Liability Scheme and Record Communications Between Industry and SDDC Regarding Freight Refund Terms

In most solicitations following the 2008 Congressional mandate to include FRV liability in DOD personal property transportation contracts, SDDC did not delete or revise the freight refund terms that were included in pre-FRV liability solicitations.  <u>See, e.g.</u>, AR 799-800, 2556, 4148.  The International Tenders issued to solicit rate filings

were treated differently.  They included the new FRV liability terms but removed the freight refund provisions.  See, e.g., AR 8510-23 (a 2008 International Tender).

In December 2010, a warehouse in Germany caught fire, destroying shipments of service members' personal property which had been transported to the warehouse by TSPs.  AR 10699, 10706.  In reaction to the warehouse fire, SDDC stated its intent to require TSPs who moved the destroyed shipments to refund their freight charges.  AR 10699-700.  The 2010 International Tender, which governed the international shipments, including those caught in the warehouse fire, did not contain freight refund terms.  Nevertheless, SDDC announced freight charges would not be paid.  AR 10706.  Subsequently, SDDC released the international tender solicitation for 2011, and included the freight refund language.  AR 9777.

After SDDC announced that freight charges would not be paid for shipments destroyed in the warehouse fire, representatives from the International Association of Movers ("IAM") questioned SDDC's authority and rationale for imposing freight refunds on claims settled at full replacement value.  AR 10714, 10716-40.  To justify the inclusion of the freight refund terms, SDDC relied on the authority granted to it under several statutes and regulations.  First, SDDC relied on 49 C.F.R. Part 375, Department of Transportation ("DOT") regulations that apply to carriers transporting household goods for "individual shippers."  AR 10712, 10716; see 49 C.F.R. §§ 375.707, 709 (freight refund terms).  SDDC stated that these provisions of the C.F.R. are "based upon the laws passed by Congress, specifically 49 U.S.C. 721 and 14706."  AR 10716.  49 U.S.C. § 721 sets forth the general administrative powers of the Surface Transportation

Board.  49 U.S.C. § 14706 is popularly known as the Carmack Amendment, and governs the liability of carriers engaged in interstate shipping.

In its correspondence with SDDC, IAM asserted that the "imposition of [freight refund terms] by the Department of Defense (DOD) contradicts settled law and commercial practice, but may also exceed the statute which requires Full Replacement Value."  AR 10717.  First, IAM stated that the "DOT regulations requiring a refund . . . on lost or damaged shipments do not apply to DOD.  Those regulations state that they apply *only* to 'individual shippers.'"  AR 10723 (citing 49 C.F.R. § 375.101).  IAM averred that "government bill of lading shippers," as separately defined under Part 375, are not subject to DOT regulations.  AR 10723-24.

IAM additionally stated that "[t]here is a very real dollar difference between the cost to the carrier of claims under the old system and under the new full replacement value system."  AR 10725.  IAM asserted that, given the increased cost under FRV liability combined with freight refund terms, "few small to medium sized carriers will be financially strong enough to pay claims at full replacement value, including shipping and taxes, and then give up revenue earned on the shipment as well."  AR 10726.  IAM also asserted that even if a TSP could afford to enter into contracts under the new scheme, these TSPs would be forced to raise their rates or exit DOD market completely.  AR 10726-27.

Finally, IAM stated that the commercial reality faced by the household goods carrier weighed against inclusion of the freight refund terms.  AR 10727.  In particular, IAM asserted that a TSP will incur the underlying costs to the shipping line or other

service providers subcontracted to transport the personal property. Id. IAM stated that even if there is a claim against these subcontracted carriers, the liability permitted under the subcontracts is often limited, sometimes by law, and shipping charges must still be paid to the underlying carrier by the TSP. Id. IAM claimed that in this case, the TSP "will have to pay the full replacement value claim *and* any underlying freight charges without receiving revenue from the Government to cover any of those costs," and concluded that this "result is unfair, unworkable, and commercially unreasonable." Id.

In addressing these concerns, SDDC maintained its position that the freight refund terms were properly included in the rate solicitations under the Carmack Amendment and 49 C.F.R. Part 375. AR 10716. In a letter to IAM, SDDC stated that "[w]e cannot pay carriers to move items that were simply not moved." AR 10732. However, SDDC went on to indicate that "[c]learly, if a shipper loses or destroys an item enroute, we would be responsible for payment of the earned freight charges to the point when the loss/destruction occurred." Id.

After SDDC declined to remove the freight refund terms and prior to the opening of the rate filing period at issue, plaintiffs filed this action on February 2, 2012. Compl. ¶¶ 2, 12. This case was transferred to the undersigned judge on April 9, 2012. Order, ECF No. 18. Briefing is now complete, and oral argument was held on May 29, 2012.

## II.    STANDARDS OF REVIEW

### A.    Dismissal for Lack of Standing under RCFC 12(b)(1)

As a threshold matter, the court must establish that it has subject matter jurisdiction over plaintiffs' claims. PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365

(Fed. Cir. 2007).  The Tucker Act grants this court "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  When a defendant challenges this court's jurisdiction under RCFC 12(b)(1), the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence.  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff.  Trusted Integration, 659 F.3d at 1163.  Additionally, when a party challenges the jurisdictional facts alleged in the complaint, the court may consider relevant evidence outside the pleadings to resolve the factual dispute.  Reynolds, 846 F.2d at 747.

Plaintiffs must have standing to invoke this court's subject matter jurisdiction.  In bid protest cases under § 1491(b), a plaintiff seeking to establish standing must demonstrate that it is an "interested party."  Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  A plaintiff is an interested party if it "'(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest.'"  Id. at 1361 (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)).  To establish that it has a "direct economic interest," a plaintiff must demonstrate "prejudice."  Id. at 1361.  To demonstrate "prejudice" in a pre-award protest, a plaintiff

must allege a "non-trivial competitive injury which can be addressed by judicial relief."

Weeks Marine, 575 F.3d at 1362.[6]

### B.   Motion for Judgment on the Administrative Record

RCFC 52.1 provides for review based on the administrative record.  Under RCFC

52.1, the court determines whether, given all the disputed and undisputed facts, a party

has met its burden of proof based on the evidence in the record.  See Bannum, Inc. v.

United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

The Federal Circuit has held that the proper standard to be applied in claims

brought under 28 U.S.C. § 1491(b)(1) is provided by the APA, 5 U.S.C. § 706(2)(A)

(2006): "a reviewing court shall set aside the agency action if it is 'arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of

Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data

Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under this

standard, a procurement decision may be set aside if either:

> (1) the procurement official's decision lacked a rational basis; or (2) the
> procurement procedure involved a violation of regulation or procedure.  A court
> evaluating a challenge on the first ground must determine whether the contracting

---

[6] In certain pre-award cases, proposals have been submitted and evaluated such that prejudice
can be assessed using a more stringent standard.  See, e.g., Med. Dev. Int'l, Inc. v. United States,
89 Fed. Cl. 691, 701 (2009) ("[B]ecause this post-competitive range challenge to the competitive
range determination is sufficiently analogous to a post-award challenge to award, the 'substantial
chance' test is the appropriate standard under which to evaluate plaintiff's claim."); see also
DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 n.10 (2010); Orion Tech., Inc.
v. United States, 102 Fed. Cl. 218, 227-28 (2011).  The government at oral argument suggested
that the court should evaluate standing under the post-award "substantial chance" standard,
because several plaintiffs have since received awards under the challenged solicitations.  Since
this issue was raised for the first time at oral argument, the court declines to consider it.  See,
e.g., Brandt v. United States, 102 Fed. Cl. 72, 77 n.4 (2011).

agency provided a coherent and reasonable explanation of its exercise of discretion.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33

(Fed. Cir. 2001)) (internal quotation omitted).  A court must find an agency decision

arbitrary and capricious if the government "entirely failed to consider an important aspect

of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or [the decision] was so implausible that it could not be ascribed to a

difference in view or the product of agency expertise."  Ala. Aircraft Indus., Inc.-

Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

However, "[t]he scope of review under the 'arbitrary and capricious' standard is

narrow and a court is not to substitute its judgment for that of the agency."  Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Instead,

the court must determine if the agency "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action," id., and "may not supply a reasoned basis for the

agency's action that the agency itself has not given."  Bowman Transp., Inc. v. Ark.-Best

Freight Sys., Inc., 419 U.S. 281, 285-86 (1974).  The court may, however, "uphold a

decision of less than ideal clarity if the agency's path may reasonably be discerned."  Id.

at 286.

If the court finds that the agency acted without a rational basis or contrary to law,

the court must "determine, as a factual matter, if the bid protester was prejudiced by that

conduct." <u>Bannum</u>, 404 F.3d at 1351.  This second prejudice determination is based on

the same standard as the initial prejudice determination.  <u>Jacobs Tech. Inc. v. United</u>

<u>States</u>, 100 Fed. Cl. 198, 207 (2011).  In pre-award bid protests, a plaintiff must establish

prejudice by demonstrating "a non-trivial competitive injury which can be redressed by

judicial relief."  <u>Magnum Opus Techs., Inc. v. United States</u>, 94 Fed. Cl. 512, 530-31

(2010) ("Given the nature of a protest brought prior to the award of a contract or issuance

of a solicitation, there is no meaningful way to further assess the prejudice to the plaintiff

after examination of the merits—if the failure to hold a competition was wrongful or

there was a material error in the solicitation, then the plaintiff has been wrongfully

deprived of the opportunity to fully and fairly compete, which suffices to establish

prejudicial injury on the merits."); <u>see also</u> <u>Distributed Solutions, Inc. v. United States</u>,

No. 06-466, 2012 WL 1570997, at *11 (Fed. Cl. Apr. 13, 2012).

## III.   DISCUSSION

### A.   Plaintiffs Possess Standing Under the Tucker Act

The government first argues that plaintiffs lack standing to bring their claim under

the Tucker Act.  The government does not dispute that plaintiffs are "actual or

prospective bidders" for purposes of standing.  Rather, the government argues that, under

the "prejudice" part of the standing test, plaintiffs do not sufficiently allege a "non-trivial

competitive injury which can be addressed by judicial relief."  <u>Weeks Marine</u>, 575 F.3d

at 1361.  The inclusion of the freight refund terms, the government argues, impacts all

TSPs that lose service member property, not just plaintiffs.  Instead, the government

argues that the inclusion of the freight refund terms properly disadvantages TSPs whose

own performance makes them more likely to lose service member property.  The government further contends that even if plaintiffs are disparately impacted by the freight refund terms, disparate impact alone is not enough to establish the prejudice required for standing.  Finally, the government argues that plaintiffs offer insufficient proof to demonstrate a competitive injury, and offer only speculative conclusions as to whether they are disparately impacted by the freight refund terms.

Plaintiffs, as small businesses, allege that they are particularly harmed by the impacts of the freight refund terms and FRV liability.  In their complaint, plaintiffs allege several competitive injuries that arise from the inclusion of the freight refund terms and general offset provisions in the challenged solicitations.  These injuries relate to the negative economic impact on plaintiffs' costs, revenues, and profit margins, which plaintiffs argue may force them to decline to bid on certain contracts, submit increased rates which would put them at a competitive disadvantage to larger TSPs, or exit the DOD personal property transportation market completely.

Plaintiffs further state that there is a direct link between a TSP's financial condition and its eligibility to compete for DOD personal property movement contracts.  Under SDDC's service provider qualifications, TSPs must maintain a specific cash and receivables-to-current liabilities ratio, called a "quick ratio," to be eligible to compete for contracts.  Pls.' Opp. to Def.'s Mot. to Dismiss, Ex. 1 at 13, ECF No. 22; see also DTR, Part IV, App. B at 4.  Moreover, in declarations submitted with their reply to the

government's motion to dismiss,[7] plaintiffs offer specific examples of how, as small businesses, they are disparately impacted by the inclusion of the freight refund terms alongside FRV liability.  Plaintiffs contend that because they are small businesses, they are more "economically vulnerable than other TSP bidders" to the increased costs and risks associated with the freight refund terms, and that the freight refund terms "threaten[] the very survival of smaller companies."  Pls.' Opp. to Def.'s Mot. to Dismiss at 14; see also id., Ex. 2 ¶ 15; Ex. 3 ¶ 16; Ex. 4 ¶¶ 14, 16; Ex. 5 ¶¶ 18-19.  In certain situations, plaintiffs argue, inclusion of the freight refund terms may cause certain plaintiffs to go out of business.  See id., Ex. 2 ¶ 13; Ex. 3 ¶ 16; Ex. 4 ¶¶ 14-15; Ex. 5 ¶¶ 16-18.

Finally, plaintiffs argue that this pre-award protest is likely the only opportunity plaintiffs have to obtain judicial review and redress of SDDC's alleged errors in including provisions that may be contrary to law.  Plaintiffs contend that the operative awards are bills of lading issued for loads booked with TSPs whose rates are accepted after the May 15, 2012 effective date of the solicitations challenged here.  In these circumstances, plaintiffs argue, they need only identify economic harm stemming from the facial defect in the solicitation to establish standing under Weeks Marine.  575 F.3d at 1363 ("[I]n some cases the injury stemming from a facially illegal solicitation may in and

---

[7] In ruling on motions for judgment on the administrative record, the "focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review."  Axiom Res. Mgmt., 564 F.3d at 1381.  The court therefore considers this information only in connection with jurisdiction and injunctive relief.  Reynolds, 846 F.2d at 747; AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 366-67 (2009).

of itself be enough to establish standing; in such a case a bidder should not have to wait until the solicitation is applied unfavorably to establish injury.").

The court finds that plaintiffs' allegations and declarations demonstrate the requisite competitive interest to establish standing under the standard outlined in Weeks Marine.  Plaintiffs have adequately explained how the freight refund terms enforced in conjunction with FRV liability would cause non-trivial competitive injury.  Based on plaintiffs' allegations and their declarations—declarations which the government has not challenged or countered—plaintiffs will experience negative economic impacts because of the inclusion of the freight refund terms, which will, in turn, affect their ability and eligibilty to bid on DOD transportation contracts and may remove them from competing in the DOD personal property transportation market altogether.  Plaintiffs' contentions, supported by declarations, that they will be "deprived of the opportunity to compete," at least for certain lanes and channels, establish the requisite prejudice for standing.  See CW Gov't Travel, Inc. v. United States, 99 Fed. Cl. 666, 673 (2011) (quoting Google v. United States, 95 Fed. Cl. 661, 674 (2011)) (finding that plaintiff established standing where it was deprived of the opportunity to compete).  Moreover, regardless of "whether [plaintiffs] are the winning or losing bidder[s]," plaintiffs have established standing because they have a "definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations."  Weeks Marine, 575 F.3d at 1362; Distributed Solutions, 2012 WL 1570997, at *12 (citing Weeks Marine to find that a "reduced right to compete is sufficient injury").

In this regard, and contrary to the government's arguments, plaintiffs do more than simply establish a disparate impact on their ability to compete, which distinguishes plaintiffs from the plaintiff in ICP Nw., LLC v. United States, 98 Fed. Cl. 29, 36 (2011). In ICP, the plaintiff challenged a provision in several Forest Service solicitations that allowed those contractors who were placed on a list for the solicited services to refuse subsequent work orders. Id. The plaintiff argued that the right to refuse work orders would cause other bidders to submit improperly low bids, in turn forcing the plaintiff to lower its own rates. Id. The plaintiff then argued, in part, that it possessed standing because it had made substantial investments in equipment necessary to perform the work orders, and that therefore, the challenged solicitations and resulting low bids imposed a disparate impact on it. Id. at 37. The court concluded that "any such impact would not be caused by the solicitation," but rather by the plaintiff's particular circumstances, and that therefore, the plaintiff lacked standing to challenge that aspect of its claim. Id.

Here, in contrast, plaintiffs do not merely allege that they will be disparately impacted by the challenged terms. Instead, plaintiffs have shown that the terms of the solicitation would cause them to experience non-trivial, negative economic impacts that affect their ability to compete. Plaintiffs' ability to compete for DOD personal property transportation contracts was materially impacted after SDDC decided to include and enforce freight refund terms along with FRV liability in the challenged solicitations. The government has not successfully rebutted this contention. If plaintiffs succeed in this protest, plaintiffs will be able to compete for certain lanes or channels—contracts from

which they will be excluded if they do not succeed.  Plaintiffs have thus established the requisite prejudice for standing under 28 U.S.C. § 1491(b)(1).

### B.     Prudential Standing Does Not Apply, But If It Did, Plaintiffs Possess Prudential Standing

The government further argues in its motion to dismiss that plaintiffs lack standing because they do not show that they have prudential standing under 10 U.S.C. § 2636a. The government asserts that plaintiffs, even if interested parties under the Tucker Act, must have prudential standing for this court to have jurisdiction over their bid protest. Specifically, the government contends that plaintiffs do not possess prudential standing because they cannot show that they are within the "zone of interests" meant to be protected by § 2636a.

To begin, the court agrees with plaintiffs that the concept of prudential standing does not generally apply to bid protests under 28 U.S.C. § 1491(b)(1).  As this court held in Santa Barbara Applied Research, Inc. v. United States, the Federal Circuit has rejected less stringent standing requirements in favor of the two-part "interested party" test.  98 Fed. Cl. 536, 544 (2011) (citing Am. Fed. of Gov't Emps., AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001)); see also MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 542 (2011).  Having satisfied this test, plaintiffs have established standing.

Furthermore, even if plaintiffs were required to establish prudential standing, the court finds that plaintiffs have established prudential standing under 10 U.S.C. § 2636a. To establish prudential standing, plaintiffs must demonstrate that "the interest sought to be protected by the [plaintiffs] is arguably within the zone of interests to be protected *or*

*regulated* by the statute" at issue.  Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970) (emphasis added).  Section 2636a may have been enacted to primarily benefit service members, but plaintiffs are nonetheless regulated by the statute.  Section 2636a and the accompanying DTR govern the liability terms of DOD contracts between plaintiffs and service members, and mandate settlement procedures with which plaintiffs must comply in the event of loss or destruction of personal property.

The government's argument that plaintiffs are jurisdictionally barred because § 2636a does not specifically mention freight refund terms runs contrary to the Supreme Court's holding that the "zone of interests" test is "not meant to be especially demanding."  Clark v. Secs. Indus. Ass'n, 479 U.S. 388, 399 (1987).  Plaintiffs do not argue that the freight refund provisions, standing alone, are contrary to law.  Plaintiffs argue that the government implemented the FRV liability scheme mandated by § 2636a in a way contrary to law when it defined "full replacement value" to include shipping costs, and at the same time required TSPs to refund freight charges.  Regardless of whether 10 U.S.C. § 2636a mentions freight refund terms, plaintiffs are entities regulated under the statute, and their injury relates directly to the implementation of the statute.  The court therefore alternatively finds that 10 U.S.C. § 2636a provides sufficient grounds for review of plaintiffs' claim, and plaintiffs have thus satisfied any prudential standing requirement.

### C.     SDDC's Inclusion of Freight Refund Terms is Not Supported in the Record and is Contrary to Carmack Amendment Liability Principles

Having found that plaintiffs have standing, the court now turns to the merits of plaintiffs' protest.  Plaintiffs argue that inclusion of the freight refund terms in the challenged solicitations violates three statutes: 10 U.S.C. § 2636a itself; 49 U.S.C. § 14706, the Carmack Amendment; and 5 U.S.C. § 558, a provision of the APA barring sanctions.  Plaintiffs also claim that the government's decision to include freight refund terms over the objection of the TSP industry was irrational because the government relied on the Carmack Amendment—which plaintiffs argue is violated by the freight refund terms—and 49 C.F.R. Part 375—which plaintiffs argue does not apply to government bill of lading shippers, such as the service members who will become parties to the bill of lading contracts subject to the terms of the solicitations.

For the reasons discussed below, the court agrees with plaintiffs that SDDC's reliance on the Carmack Amendment to justify the inclusion of the freight refund terms is contrary to law.  The challenged solicitations violate Carmack Amendment liability principles by going beyond the liability ceiling established by that statute.  Moreover, the court agrees with plaintiffs that even if the government has authority to require a TSP to pay damages that go beyond the Carmack Amendment's liability ceiling, that authority is not absolute—the government may not exact a penalty that goes beyond damages sustained as a result of the loss or destruction of service members' personal property.

Before addressing the parties' specific arguments, the court first turns to a brief discussion of the Carmack Amendment and 49 C.F.R. Part 375, the DOT regulations governing interstate shipments of household goods.

### 1.    The Carmack Amendment and 49 C.F.R. Part 375.

Both plaintiffs and the government rely on the carrier[8] liability limitations embodied in the Carmack Amendment, 49 U.S.C. § 14706.  Congress enacted the Carmack Amendment in 1906 to establish uniform federal guidelines designed to remove uncertainty surrounding a carrier's liability when loss or damage occurs to a shipper's interstate shipment.  Adams Express Co. v. Croninger, 226 U.S. 491, 503-05 (1913).  The Carmack Amendment was designed to occupy the field of interstate transportation to avoid the confusion of conflicting state laws, id., and applies to motor carriers only in the interstate transportation context.  49 U.S.C. § 13501(1).  Here, the government does not dispute that the Carmack Amendment applies to the interstate shipments covered by the challenged solicitations.  See Def.'s Cross-Mot. at 19.[9]

---

[8] As noted above, "carrier" is a general term for a TSP.  "Shipper" refers to a person or entity using a carrier's service for shipment.

[9] Under the DTR and the challenged solicitations, FRV liability for both domestic and international shipments "must be determined [in accordance with] the Carmack Amendment to the Interstate Commerce Act, (Title 49, United States Code, Section 14706, Liability of Carriers Under Receipts and Bills of Lading) unless a specific provision . . . establishes a different rule or procedure."  DTR, Part IV, App. G, Attach. G6, § B.2.a.  As discussed in detail below, the Carmack Amendment and its implementing DOT regulations, which apply to individual consumer shippers, mandate slightly different liability terms than the DTR.  However, contrary to the government's argument, the court does not interpret this provision as allowing the government to impose increased damages on TSPs that go beyond what is permissible under the Carmack Amendment.

Since the enactment of the Carmack Amendment, a carrier of an interstate shipment is "liable to the person entitled to recover under the receipt or bill of lading." 49 U.S.C. § 14706(a)(1).  The person entitled to recover can bring a suit for "actual loss or injury to the property caused" by any carrier in the course of the interstate shipment. Id.  The Supreme Court has construed actual loss or damage broadly:  "The words of the statute are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination."  Se. Express Co. v. Pastime Amusement Co., 299 U.S. 28, 29 (1936) (quotation omitted).  Courts have accordingly construed "actual loss or damage" under the Carmack Amendment to include damages for delay, lost profits, and reasonably foreseeable consequential damages.  Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc., 325 F.3d 924, 931 (7th Cir. 2003).

For the shipment of household goods, "actual loss or damage" traditionally meant the depreciated value of the household goods, since most household goods were used goods.  Released Rates of Motor Common Carriers of Household Goods ("2001 Released Rates"), 2001 WL 1637941, at *1 (S.T.B. Dec. 18, 2001).  Under the depreciated value option, a household goods shipper could either accept a statutorily-prescribed $1.25 per pound liability payment, or declare a higher value by paying a valuation charge.  Id. at *2.

However, the Carmack Amendment also permits the Surface Transportation Board ("STB")[10] to establish rates and liability limitations that may deviate from this standard. 49 U.S.C. § 14706(f)(1).  Liability requirements under the Carmack Amendment have since been changed by Congress and the STB, pursuant to this authority, for interstate shippers of household goods that provide their services to "individual shippers."[11]

Since 2001, household goods carriers offering their services to interstate shippers may offer two liability options.  <u>Released Rates of Motor Common Carriers of Household Goods</u> ("<u>2011 Released Rates</u>"), 2011 WL 192635, at *1-2 (S.T.B. Jan. 19, 2011).  The first is a "released rate" option, which values household goods at $0.60 per pound—

---

[10] The ICC Termination Act of 1995, 49 U.S.C. § 10501 <u>et seq.</u>, abolished the Interstate Commerce Commission ("ICC"), which previously had jurisdiction over the commercial activities of household goods motor carriers.  Its functions relating to household goods carriers were split between the STB and the Secretary of the Department of Transportation. The STB was given jurisdiction over most rate regulation, while the Secretary was given jurisdiction over consumer protection matters, which the Secretary delegated to the Federal Motor Carrier Safety Administration.  <u>See</u> Transportation of Household Goods in Interstate Commerce; Consumer Protection Regulations:  Released Rates of Motor Carriers of Household Goods, 77 Fed. Reg. 25,371, 25,371 (Apr. 30, 2012) (to be codified at 49 C.F.R. Part 375).

[11] The shipment of household goods by individual consumers is governed in part by the regulations found in 49 C.F.R. Part 375.  A household goods motor carrier must follow Part 375's regulations when offering its services to "individual shippers" in interstate commerce.  49 C.F.R. § 375.101.  "Individual shipper" under Part 375 is defined as:

> any person who--
> (1) Is the shipper, consignor, or consignee of a household goods shipment;
> (2) Is identified as the shipper, consignor, or consignee on the face of the bill of lading;
> (3) Owns the goods being transported; and
> (4) Pays his or her own tariff transportation charges.

49 C.F.R. § 375.103.  A "government bill of lading shipper" is defined separately in Part 375 as "any person whose property is transported under the terms and conditions of a government bill of lading issued by any department or agency of the Federal government to the carrier responsible for the transportation of the shipment."  <u>Id.</u>

substantially less than depreciated value—and thus offers a lower shipping rate. Id. To elect the lower, released rate option, the shipper and the carrier must follow certain procedures under the Carmack Amendment. See 49 U.S.C. § 14706(f)(3).

The second option, "Full Value Protection," was first authorized by the STB in 2001 and replaced the old "depreciated value" liability option. 2001 Released Rates, 2001 WL 1637941, at *8. Under the Full Value Protection option, a shipper declares a total value for the goods in the shipment, and in the event of loss or destruction to the shipment, the carrier pays the shipper the "replacement value" of goods comparable to those lost or destroyed, up to the *declared value of the shipment.* 2011 Release Rates, 2011 WL 192635, at *2. In 2005, Congress amended the Carmack Amendment to make the Full Value Protection option the default liability option for the interstate movement of household goods. Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), § 4207, Pub. L. No. 109-59 (codified in relevant part at 49 U.S.C. § 14706(f)). Thus, pursuant to SAFETEA-LU, the full protection level for interstate carriers effectively changed from "actual loss or injury" to "replacement value" under Full Value Protection liability. 2011 Released Rates, 2011 WL 192635, at *2; 49 U.S.C. § 14706(f).

The DOT regulations implementing the Carmack Amendment's liability scheme are found at 49 C.F.R. Part 375. These regulations apply to carriers offering their services to individual shippers for the interstate movement of household goods. 49 C.F.R. § 375.101. The DOT regulations authorize, consistent with the Carmack Amendment, Full Value Protection liability. Id. § 375.201(b). The DOT regulations also

include freight refund terms.  If a shipment is partially or totally lost or destroyed, the carrier must refund the portion of the freight charges relative to the property lost or destroyed in transit.  Id. §§ 375.707, 709.

The court now turns to the parties' specific arguments.  First, the court addresses plaintiffs' argument that SDDC's reliance on 49 C.F.R. Part 375 as the basis for the freight refund provisions is not justified.  The court then discusses whether the inclusion of the freight refund terms alongside FRV liability in the challenged solicitations violates the Carmack Amendment, based on the history of freight refund terms and Carmack Amendment case law.  Finally, the court addresses whether SDDC may require plaintiffs to pay damages that go beyond making the government and the service member whole under the terms of the solicitations.

> **2.    SDDC's reliance on 49 C.F.R. Part 375 was unjustified because Part 375 by its terms does not apply to government shippers, does not define "replacement value" to include shipping costs and sales tax at destination, and therefore does not mandate the freight refunds set forth in the solicitations.**

In the record before the court, SDDC relied on the Carmack Amendment and 49 C.F.R. Part 375, the DOT regulations governing the "individual shipper" movement of household goods, to justify the inclusion of the solicitations' freight refund terms.  AR 10716.  At the outset, plaintiffs claim that any reliance on 49 C.F.R. Part 375 is arbitrary and capricious, because those regulations by their own terms do not apply to "government bill of lading shippers."  See 49 C.F.R. §§ 375.101, 103.  The court agrees

that the regulations do not apply to government bill of lading shippers.[12]  However, that error would be harmless if the DOT regulations, pursuant to the Carmack Amendment, similarly provide for a definition of "full replacement value" that includes the cost of shipping, and also authorize freight refunds.  See Bowman, 419 U.S. at 286 (holding that a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").  If SDDC were simply following Part 375, SDDC's actions would be consistent with existing DOT regulations governing the interstate shipments of personal property, and therefore justified.  AR 2883 (NG-2012), 11060 (IT-2012) (terms of the solicitations stating that liability will be determined in accordance with the Carmack Amendment).

Yet, a careful review of Part 375 reveals that the relevant DOT regulations are not identical to the liability and freight refund terms found in the solicitations.  In particular, 49 C.F.R. Part 375 and the Carmack Amendment—in contrast to the DTR and the solicitations—do not expressly define "replacement value" to include the payment of shipping costs and sales tax at destination by the carrier.  First, the Carmack Amendment itself does not expressly define "replacement value" under the Full Value Protection

---

[12] As noted above, by its own terms, 49 C.F.R. Part 375 only applies to "individual shippers." Id. § 375.101.  "Individual shipper" is defined by the regulations as a shipper who "[p]ays his or her own tariff transportation charges."  Id. § 375.103.  49 C.F.R. § 375.103 also separately defines "government bill of lading shipper" as "any person whose property is transported under the terms and conditions of a government bill of lading issued by any department or agency of the Federal government to the carrier responsible for the transportation of the shipment."  The government does not address plaintiffs' objection that Part 375 does not apply to government bill of lading shippers.  Instead, the government argues that the government "does not rely on 49 C.F.R. Part 375 as its basis to collect" freight refunds.  Def.'s Cross-Mot. at 33.  Thus, the court agrees with plaintiffs that the regulations in 49 C.F.R. Part 375 do not apply to government bill of lading shippers who will be parties to the bills of lading governed by the terms of the challenged solicitations.

option.  A House Report accompanying SAFETEA-LU, which changed the standard liability to Full Value Protection, only states that Full Value Protection is "defined as the replacement cost in the event of loss or damage up to the *pre-declared* total value of the shipment."  H.R. Rep. No. 109-203, at 1011 (2005) (Conf. Rep.) (emphasis added).

The DOT regulations do not provide a definition for "replacement value" under Full Value Protection liability either.  The model consumer language in 49 C.F.R. Part 375 provides for the cost of replacement but does not mention shipping charges or taxes at destination.  Rather it states only:

> If any article is lost, destroyed, or damaged while in your mover's custody, your mover will, at its option, either:  repair the article to the extent necessary to restore it to the same condition as when it was received by your mover, or pay you for the cost of such repairs; replace the article with an article of like kind; or pay you for the cost of a replacement article at the current market replacement value, regardless of the age of the lost or damaged article.

49 C.F.R. Part 375, App. A.

STB decisions regarding SAFETEA-LU also do not define "replacement value" under Full Value Protection liability.  A 2007 STB decision states that under SAFETEA-LU, "the standard (or default) cargo liability of a [household goods] carrier is now the replacement value of the goods (for example, the value of a comparable new television to replace a used television that was lost in a household move, rather than the depreciated value of the used television)."  Released Rates of Motor Common Carriers of Household Goods, Amendment 4 to Released Rates Decision MC-999, 2007 WL 1696988, at *1 (S.T.B. June 11, 2007).

Thus, unlike the DTR and the solicitations, the DOT regulations do not expressly define "replacement value" to include shipping charges and sales tax at destination.  In such circumstances, SDDC's reliance on 49 C.F.R. Part 375 was misplaced.  Not only is Part 375 not applicable to government shipments, see §§ 49 C.F.R. 375.101, 103; supra, note 12, but even if it were to apply to the movement of service member goods under government bills of lading, the DOT regulations do not expressly authorize freight refunds under the same terms as required by SDDC.

> **3.      The inclusion of freight refund terms alongside FRV liability violates the Carmack Amendment by requiring damages that go beyond the Carmack Amendment's liability ceiling.**

In addition, the court agrees with plaintiffs that, under the Carmack Amendment, freight refunds may not be imposed where a shipper is otherwise made whole by the liability provisions of a bill of lading.  The court bases this conclusion on the history of freight refund terms as applied to household goods shippers and well-established cases interpreting the liability limits set by the Carmack Amendment.

> **a.      The history of freight refund terms suggests that freight refunds may not be imposed where the measure of damages includes transportation costs.**

The Interstate Commerce Commission ("ICC"), predecessor to the STB, first mandated freight refunds for consumer household goods shipments in 1971.  Petition for Declaratory Order—Household Goods Freight Charges, 114 M.C.C. 176 (1971).  The ICC ultimately concluded that a household goods carrier could not collect freight charges when a household goods shipment is totally lost or destroyed.  Id. at 199 ("We conclude that where an interstate household goods shipment is totally destroyed and does not reach

its destination, a carrier may not . . . collect its lawfully published charges from the shipper inasmuch as the carrier's obligation to transport to the agreed destination has not been performed.").

In so holding, the ICC emphasized the differences between household goods shippers and commercial shippers, who ordinarily pay freight charges on lost or destroyed goods.  First, the ICC found that household goods shippers are not as sophisticated as commercial shippers, and therefore should be entitled to stricter protections.  Id. at 196.  Second, the ICC agreed that the ordinary damages awarded to commercial shippers implicitly include freight charges, while the liability options available to household shippers did not.  Id. at 194-95.  The ICC noted that commercial shippers typically receive damages for lost, destroyed, or damaged goods based on "market value at destination," into which the commercial shipper factors freight charges and other costs.[13]  Id. at 181, 195.  The ICC found that, unlike commercial shippers, household shippers rarely know the worth of their goods, and cannot spread the risk of loss by reselling their goods at market value.  Id. at 195-96.  For these reasons, the ICC concluded that household goods shippers should not be obligated to pay freight charges for lost or destroyed household goods where they only receive the "actual loss or value"

---

[13] This interpretation is confirmed in the early case law pertaining to the shipment of commercial goods under the Carmack Amendment.  See Am. Nat'l Fire, 325 F.3d at 932 (reviewing early case law and finding that commercial shippers are obligated to pay freight charges for lost or destroyed goods because the measure of damages under the Carmack Amendment for commercial goods is the market value at destination, which includes "the price of the freight, as well as all necessary costs to the shipper such as insurance and taxes").

of their goods (as opposed to the "market value at destination," which, for commercial shippers, includes freight charges) under the Carmack Amendment.  Id. at 199.

The ICC codified this conclusion in a 1977 decision, which also set forth a regulation governing partial loss or destruction.  Practices of Motor Common Carriers of Household Goods (Collection of Freight Charges on Household Goods Shipments Lost or Destroyed), 126 M.C.C. 250, 285 (1977).  There, the ICC, discussing its 1971 decision, reiterated that "it is the duty of the common carrier to deliver the shipment to the destination, that it is the concurrent duty of the shipper to pay the freight charges upon completion of delivery, and that the [market value rule, which applies to commercial shippers who include freight charges in determining damages and requires commercial shippers to pay freight charges on lost or destroyed goods,] should not be applied under these circumstances because household goods are not shipped for resale and are not enhanced in value as a result of such transportation."  Id. at 264, 264 n.5.

The ICC subsequently amended its rule regarding proportional refunds of freight charges for partial loss or destruction a number of times, but did not change the ultimate conclusion that a household goods carrier may not collect freight charges for lost or destroyed shipments.  In response to a 1989 amendment, carrier industry representatives argued again against freight refunds for household goods shippers.  Return of Proportional Freight Charges by Motor Carriers of Household Goods, 5 I.C.C.2d 836, 837 (1989).  The industry representatives argued, in part, that freight refund provisions should not apply to household goods shipments subject to the then-authorized depreciated value liability limits, because the depreciated value liability settlements effectively

included freight charges.  Id.  However, the ICC rejected this argument:  "The

[industry's] statements that . . . the payment of claims for lost or destroyed articles also

includes consideration of freight charges [is] not self-evident."  Id. at 838.

Taken together, the ICC decisions hold that a household goods shipper must

receive a refund of its freight charges because the damages the shipper receives for lost or

destroyed goods do not incorporate those freight charges.  However, in this case, the

court agrees with plaintiffs that the solicitations' express inclusion of shipping costs at

destination in the definition of "full replacement value" obviates that rationale.  If

household goods shippers *are* able to recover their shipping costs in their claims for loss

or destruction—as they are under the FRV liability terms of the challenged

solicitations—the TSP carrier should be able to collect freight charges, as in the

commercial context.

> **b.    Under the Carmack Amendment, a shipper may not receive damages above and beyond those that make it whole under the bill of lading.**

This conclusion is supported by the law governing Carmack Amendment liability

for commercial goods.  As noted above, commercial shippers are ordinarily obligated to

pay freight charges for lost or destroyed goods because the damages for commercial

goods are usually measured by "market value at destination."[14]  See Am. Nat'l Fire, 325

---

[14] The court notes that under DOT regulations governing individual shippers, "replacement value" is defined as "current market replacement value."  49 C.F.R. Part 375, App. A.  The court is careful to distinguish between "market replacement value" in the household goods context and "market value at destination" in the commercial context.  As noted above, a commercial shipper expects the commercial goods it ships to be worth more at destination, as measured by the "market value at destination."  This measure of damages includes "the price of the freight," and

-37-

F.3d at 932.  However, when damages are measured by a shipper's costs at origin, rather than market value at destination, freight refunds may be appropriate under the Carmack Amendment, even in the commercial goods context:

> The reason for including freight in the measure of damages when the shipper's cost (or the market value at place of shipment) is employed as the starting point is that the Carmack Amendment allows recovery of lost profits under the ordinary measure of damages.  When the shipper's costs are used [as a measure of damages under the Carmack Amendment in the bill of lading], however, the profit is unknown. We can assume, however, that the shipper at least would have been able to recover in the market at destination his freight, taxes, fees and insurance in addition to the price he paid for the commodity.  Thus these items can be recovered (or added to the value) when the measure of damages is the cost to the shipper less the value of the damaged goods.
>
> A rule allowing freight to be recovered when the value is determined by the shipper's cost (or the value at the place of shipment) but not allowing freight to be recovered when value is determined by the market rate if undamaged at destination comports with the Carmack Amendment decisions.

Am. Nat'l Fire, 325 F.3d at 933.[15]  In other words, where a shipper's costs at origin are used as a measure of damages, rather than market value at destination, a shipper's damages do not include freight charges.  Id.  Therefore, the shipper may be entitled to a

---

therefore, by selling its goods at that price or receiving that measure of damages, the commercial shipper receives the benefit of the transportation of its goods.  See Am. Nat'l Fire, 325 F.3d at 932. By contrast, in the household goods context, a household goods shipper does not expect to resell its goods; when the household goods shipper receives "market replacement value," the household goods shipper is not making a profit on his or her goods.  Therefore, unlike the commercial shipper, the household goods shipper is not implicitly receiving the benefit of the transportation by receiving the market replacement value.

[15] In some unique circumstances in the commercial goods context, freight charges may also be recovered if the entire shipment is damaged in a way that is not obvious upon delivery, and that subsequently makes the entire shipment commercially useless.  See Marquette Cement Mfg. Co. v. Louisville & Nashville R.R. Co., 406 F.2d 731, 731-32 (6th Cir. 1969); Contempo Metal Furniture Co. of Cal. v. E. Tex. Motor Freight Lines, 661 F.2d 761, 764 (9th Cir. 1981).

refund of the freight charges associated with the lost or destroyed commercial goods.  Id. This reasoning is supported by early and modern Carmack Amendment decisions.  Id.; see Pa. R.R. Co. v. Olivit Bros., 243 U.S. 574, 586 (1917); Am. Nat'l Fire, 325 F.3d at 933-34; Albion Elevator Co. v. Chi. & N.W. Transp. Co., 254 N.W.2d 6, 18 (Iowa 1977) ("[W]here a shipper, as here, receives only the *point of shipment* value of the lost commodity rather than its destination value, a measure of damages which permits him to recover freight charges paid on the lost portion of the shipment as compensation for his 'full actual loss' is proper." (emphasis added)); Marjan Int'l Corp. v. V.K. Putman, Inc., No. 92 Civ. 8531, 1993 WL 541204, at *13-14 (S.D.N.Y. Dec. 28, 1993) ("In the usual cases, where the main element of the damages consists of loss or damage to cargo, recovery of freight charges has characteristically been denied in that such an award would make plaintiffs better than whole; the usual reason appears to be that freight charges were included in the invoice price at destination or had otherwise not been paid by the shipper.").[16]

These interpretations of carrier liability under the Carmack Amendment demonstrate that the Carmack Amendment, in connection with freight charges, places a ceiling on carrier liability.  Under the Carmack Amendment, a shipper may not recover

---

[16] Another measure commonly used for the loss or destruction of commercial goods is the replacement cost of those goods when the shipper is able to timely purchase replacements and then sells those replacements.  In those circumstances, the shipper can recover the costs of freight by selling the replacements at market value, is made whole when the carrier pays for the replacement costs, and must therefore pay the freight charges to the carrier.  Am. Nat'l Fire, 325 F.3d at 935 n.7.  However, as mentioned in note 14, supra, unlike commercial goods shippers who may resell their replacements and recover freight charges, household goods shippers do not typically resell their replacement household goods for a profit that incorporates freight charges. See Petition for Declaratory Order—Household Goods Freight Charges, 114 M.C.C. at 182.

freight charges if the measure of damages the shipper receives under the chosen liability scheme puts the shipper back in the position he or she would have been in had the carrier successfully completed delivery.  See, e.g., Marjan, 1993 WL 541204, at *13 ("The policy underlying the general rule against recovery of freight charges from a common carrier derives from the compensatory function of contract damages. . . . Such damages ought go no further than to make the shipper whole for the actual loss or injury suffered by reason of the carrier's breach.") (citing 11 Williston on Contracts § 1338 (3d ed. 1968); Pa. R.R. Co., 243 U.S. at 586).  In other words, where the shipper gets the benefit of the transportation—either in the form of successful delivery or damages that include delivery of a replacement item at destination—the carrier is entitled to retain its freight charges.  Am. Nat'l Fire, 325 F.3d at 932 (quoting The Oneida, 128 F. 687, 692 (2d Cir. 1904) (Wallace, J. concurring)).

The parties do not dispute that under the Carmack Amendment, a shipper of household goods may choose to allow a carrier to *limit* its liability for lost, destroyed, or damaged goods in the bill of lading, and thus pay lower rates.  49 U.S.C. § 14706(f); see Part III.C.1, supra.  However, the court agrees with plaintiffs that the shipper may not seek *additional* damages under the Carmack Amendment that would make the shipper more than whole under the contract.

> **c.  The freight refund terms in the challenged solicitations, when implemented alongside FRV liability, violate the Carmack Amendment's carrier liability ceiling.**

Applying this principle to the case at hand, SDDC's implementation of the FRV mandate alongside the freight refund terms goes too far.  In this case, the FRV liability

terms in the DTR and the solicitations expressly incorporate shipping costs in the "full

replacement value" that a service member is entitled to recover.  DTR, Part IV, App. G,

Attach. G6, § B.3.g; AR 2883-85 (NG-2012), 11060-61 (IT-2012).  Yet, if freight

charges are included in the measure of damages, then the freight refund terms improperly

convey a benefit on the shipper that exceeds the Carmack Amendment's liability ceiling.

See Am. Nat'l Fire, 325 F.3d at 932 (finding that under the "basic rule of damages for

cases involving the carriage of goods" where "the shipper thus gets the benefit of the

transportation, the carrier should not lose the freight") (quoting The Oneida, 128 F. at 692

(Wallace, J., concurring)); Marjan, 1993 WL 541204, at *13.

     The court thus agrees with plaintiffs that the freight refund provisions, when

implemented alongside the FRV liability scheme, provide more than full compensation to

the government and the service member because they require that a TSP pay for

successful delivery of a replacement item and also forgo its own freight charges.

Therefore, the court holds that the use of freight refund terms in conjunction with FRV

liability violates the Carmack Amendment, and is contrary to law.  Thus, to the extent

SDDC relies on the Carmack Amendment to justify the inclusion of the freight refund

terms, see AR 10716, this reliance is not supported.

     In response to plaintiffs' challenges to its reliance in the record on the Carmack

Amendment and 49 C.F.R. Part 375, the government now asserts that 37 U.S.C. § 476—

governing household goods transport for service members—delegates broad authority to

DOD to regulate the movement of service members' personal property.  This broad

delegation, the government argues, authorizes the government to go beyond the Carmack

Amendment's liability ceiling to include the subject freight refund terms.  The

government further interprets the Carmack Amendment itself as allowing the government

to include any terms it wants in the government bills of lading controlling DOD personal

property moves.

At the outset, the court notes that SDDC did not rely on the authority delegated to

DOD under 37 U.S.C. § 476 as a justification for its actions.  Section 476 is not

mentioned anywhere in the administrative record as a justification for freight refund

terms.  However, even if the government were not constrained by the Carmack

Amendment's liability ceiling, the government's authority to define damages in its

contracts is not boundless.  It is well-settled that "[i]t is customary, where Congress has

not adopted a different standard, to apply to the construction of government contracts the

principles of general contract law."  Fomby-Denson v. Dep't of Army, 247 F.3d 1366,

1373 (Fed. Cir. 2001) (citing Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411

(1947)).  As discussed above, courts interpreting the Carmack Amendment have held that

the Carmack Amendment's liability ceiling is grounded in the basic contract law

principle that damages are compensatory in nature, and that therefore, freight refund

terms may not be imposed when they would make the shipper more than whole.  See Am.

Nat'l Fire, 325 F.3d at 932 (quoting The Oneida, 128 F. at 692 (Wallace, J., concurring));

Marjan, 1993 WL 541204, at *13.

In this case, the standard form government bill of lading governing household

goods shipments describes the contract benefits expected of the TSP: to "forward[] to

destination . . . [a service member's (the consignee's) property], there to be delivered in

good order and condition to said consignee."  DTR Part IV § 413, Figure 413-1, Form SF

1203, Block 16.  The court agrees with plaintiffs that the challenged solicitations'

requirement that "full replacement value" include shipping costs to destination provides

this benefit.  To require TSPs to forgo their freight charges on top of this requirement

goes beyond "the compensatory function of contract damages."  Marjan, 1993 WL

541204, at *13; see also Am. Nat'l Fire, 325 F.3d at 935 ("Although the shipper can

recover all damages resulting from the carrier's negligence, the shipper cannot recover

more than the injury suffered." (quotations omitted)).

        To further justify the freight refund terms as an enforceable measure of damages,

the government argues that the freight refund terms do not go beyond the compensatory

function of damages because the government's interests under the bill of lading stand

separate and apart from the service members' interest in receiving their property at their

destination duty stations.  The government argues that, for its part, the freight refund

terms are necessary to "ensure that TSPs are properly incentivized to deliver service

member property."  Def.'s Cross-Mot. at 22.  However, the court agrees with plaintiffs

that damages may not be used to solely incentivize performance.[17]  While "[a]ll

provisions for damages are, of course, deterrents of default," where damage provisions

are "included not to make a fair estimate of damages to be suffered but to serve only as a

spur to performance, . . . courts do not give their imprimatur to such arrangements."

---

[17] The government argues in its briefs that a TSP shipping low-valued household goods may
simply elect not to ship the goods and instead pay for the replacement costs.  Def.'s Cross-Mot.
at 22.  However, there is nothing in the record to support this view, and where, as here, the TSP
must pay full replacement value up to $50,000, there is no basis to conclude that the
government's concern is correct.

Priebe, 332 U.S. at 413; JMNI, Inc. v. United States, 4 Cl. Ct. 310, 315 (1984); Ogden

Dev. Corp. v. Fed. Ins. Co., 508 F.2d 583, 586 (2d Cir. 1974) (interpreting a damages

provision in a bid request as amounting to a penalty); see also DJ Mfg. Corp. v. United

States, 86 F.3d 1130, 1136 (Fed. Cir. 1996) (holding that damages provisions may not

spur performance when the damages do not serve a compensatory function).  The

government's argument that the freight refund terms may be included in the solicitations

to "incentivize" performance, rather than to provide compensation for damages suffered

under the contract, is thus contrary to well-settled contract law.

    In sum, the court concludes that the inclusion of the freight refund terms alongside

FRV liability in IT-2012 and NG-2012 violate the liability principles established by the

Carmack Amendment.  Under the Carmack Amendment, as well as more general

principles of contract law, a household goods shipper may not require a carrier to refund

its freight charges if the shipper's damages for lost or destroyed goods include shipping

costs for the replaced goods.  Yet, the challenged solicitations do just that by including

the freight refund provisions alongside the mandated FRV liability, which defines "full

replacement value" to include shipping costs and sales tax at destination.  This

impermissibly requires the carrier to forgo its freight charges even though it has placed

the government and the service member in the position they would have been in had the

contract been successfully performed.  For these reasons, the terms of the solicitation are

contrary to law.[18]

---

[18] Because the court finds that the freight refund terms violate the Carmack Amendment and that
SDDC's reliance on 49 C.F.R. Part 375 is not supported, the court does not address plaintiffs'

### D.    Plaintiffs Have Established Prejudice

Having determined that the inclusion of the freight refund terms in IT-2012 and NG-2012 violate the Carmack Amendment and that SDDC's reliance on 49 C.F.R. Part 375 is not justified, the court must determine whether plaintiffs have been prejudiced by SDDC's actions.  Given the nature of a pre-award protest, courts have concluded that "there is no meaningful way to further assess the prejudice to the plaintiff after examination of the merits—if the failure to hold a competition was wrongful or there was a material error in the solicitation, then the plaintiff has been wrongfully deprived of the opportunity to fully and fairly compete, which suffices to establish prejudicial injury on the merits." Magnum Opus, 94 Fed. Cl. at 531; see also Distributed Solutions, Inc. v. United States, No. 06-466, 2012 WL 1570997, at *11-12, 15 (Fed. Cl. Apr. 13, 2012) ("There is no meaningful way to assess prejudice if the [government's actions were] wrongful or not adequately supported.  Plaintiffs were wrongfully deprived of the opportunity to fully and fairly compete, which suffices to establish prejudice on the merits.").  Having already determined that plaintiffs have established a non-trivial competitive injury based on the negative economic impacts caused by the freight refund terms that have deprived, or at least lessened, plaintiffs' ability to compete in the challenged solicitations for certain lanes and channels, the court concludes that, on the merits, plaintiffs were prejudiced by SDDC's inclusion of the freight refund terms.  See

---

alternative arguments that inclusion of the freight refund requirement also violates 10 U.S.C. § 2636a and 5 U.S.C. § 558.

Part III.A, supra; Distributed Solutions, 2012 WL 1570997, at *11 (citing Weeks Marine to hold that a "reduced right to compete" is sufficient injury).

### E.   Declaratory and Injunctive Relief is Proper in this Case

Plaintiffs request that the court enter an order declaring that SDDC's inclusion of the freight refund terms in the challenged solicitations is arbitrary, capricious, irrational, an abuse of discretion, and contrary to law and Congressional intent.  Plaintiffs also request a permanent injunction to require the government to amend the IT-2012 and NG-2012 rate solicitations by eliminating the freight refund terms and to refrain from awarding contracts for the transportation of service members' personal property that incorporate the freight refund terms.  Pls.' Mot. at 38-39.  At argument plaintiffs also requested that the government be enjoined from enforcing the invalid terms in those solicitations for any contracts that have already been awarded.  See A.T. & T. v. United States, 177 F.3d 1368, 1376 (Fed. Cir. 1999) (en banc) ("When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory; the courts have not, however, simply declared the contract void ab initio.").

The court has considerable discretion in determining whether to award declaratory and injunctive relief in a bid protest.  See 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."); see also PGBA, LLC v. United States, 389 F.3d 1219,

1226 (Fed. Cir. 2004) (acknowledging the court's "equitable discretion in deciding whether injunctive relief is appropriate").  In deciding whether a permanent injunction should issue, a court considers: (1) whether the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1036-37 (Fed. Cir. 2009). Plaintiffs have satisfied the first criterion by demonstrating that they were prejudiced by SDDC's inclusion of the freight refund terms in violation of the Carmack Amendment and SDDC's unreasonable reliance on inapplicable regulations to justify its decision in the record.  See supra Part III.C, D.

Under the second criterion, plaintiffs contend that if an injunction is not issued, then plaintiffs will suffer irreparable harm because, unless the court enjoins such action, plaintiffs may not be eligible for award or will experience reduced ability to compete for certain lanes and channels.  See, e.g., Pls.' Opp. to Def.'s Mot. to Dismiss, Ex. 2 ¶¶ 13, 15.  Irreparable harm is established by a lost opportunity to fairly compete.  See, e.g., HP Enter. Servs., LLC v. United States, No. 11-888C, 2012 WL 1131584, at *17 (Fed. Cl. Apr. 5, 2012) (citing several cases); Magnum Opus, 94 Fed. Cl. at 544 ("A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.") (citations omitted).  To the extent that plaintiffs are eligible for certain lanes and channels, plaintiffs also argue that they will experience severely decreased or non-existent profit margins based on the freight refund terms, and

that they may go out of business altogether because of the increased costs associated with the freight refund terms.  See id., Ex. 2 ¶¶ 13, 15; Ex. 3 ¶¶ 10, 16; Ex. 4 ¶¶ 10, 14; Ex 5 ¶¶ 11, 16.  The court has repeatedly held that "the loss of potential profits" from a government contract constitutes irreparable harm.  See e.g., Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012) (citing BayFirst Solutions, LLC v. United States, 102 Fed. Cl. 677, 696 (2012)); MORI Assocs., 102 Fed. Cl. at 552-53.  The court has also held that where a plaintiff is unlikely to remain in business absent an injunction, see Pls.' Opp. to Def.'s Mot. to Dismiss, Ex. 2 ¶ 13, a plaintiff has shown irreparable harm.  Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 26 (2005).  Therefore, the court agrees that plaintiffs will suffer irreparable harm if an injunction does not issue.

As to the third criterion, the government argues that the hardships weigh in its favor because it will suffer harm by "losing its longstanding potential remedy of collecting [freight refunds.]"  Def.'s Cross-Mot. at 35.  However, as discussed above, the court finds that the FRV liability scheme serves the same purpose of the freight refund terms by requiring that "full replacement value" include shipping costs to a service member's destination.  For this reason, plaintiffs effectively argue that the balance of hardships favors plaintiffs because the service members are not harmed by enjoining the government from including or enforcing the illegal terms in the solicitations.  The court finds the hardships to plaintiffs of not correcting the solicitation exceed the hardships to the government.

With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law.  See Magnum Opus, 94 Fed. Cl. at 551.  However, not every

violation of law warrants correction through an injunction.  See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312-13 (1982) (holding that a court has discretion to decline a request for injunction even where there is a conceded violation of law.); PGBA, LLC, 389 F.3d at 1226 (holding that an injunction is not automatic under the Tucker Act in the event of an unlawful contract award).  Here, given that the effective date for the terms established under the solicitation has passed, and that plaintiffs did not seek any interim injunctive relief, the court is mindful that certain moves may have been scheduled or even completed under the solicitations in question and that several more may be ongoing.  The public interest in ensuring that service member moves continue without disruption must also be considered.

In this connection, the court must tailor an injunction that will not disrupt ongoing or future moves.  See Magnum Opus, 94 Fed. Cl. at 551 (tailoring injunctive relief to serve the public interest).  To this end, the court concludes that the public interest is best served by imposing an injunction that will allow the challenged rate solicitations to remain in effect but will bar the government from either including the illegal terms in any government bills of lading issued in the future or from enforcing the illegal terms in issued bills of lading.  The government is of course free to conduct a new solicitation.  However, the court does not wish to disrupt any service member moves, and by eliminating the offending language, plaintiffs' concerns based on their competitive injuries have also been eliminated.

For all of these reasons, the court concludes that the above-described injunctive relief, in addition to declaratory relief, is proper in this case.

IV.     CONCLUSION

In sum, the court holds that plaintiffs have standing to bring their protest.  The

government's motion to dismiss is thus **DENIED**.  On the merits, the court holds that the

government incorrectly relies on 49 C.F.R. Part 375 to justify the inclusion of the freight

refund terms along with "full replacement value" liability in the record.  Moreover, the

use of the freight refund terms in conjunction with "full replacement value" liability

violates the liability ceiling established by the Carmack Amendment, and is thus contrary

to law.  Plaintiffs' motion for judgment on the administrative record is therefore

**GRANTED**.  The government's cross-motion for judgment on the administrative record

is **DENIED**.  The court hereby **DECLARES** SDDC's inclusion of the current freight

refund provisions in IT-2012 and NG-2012, at IT-2012 Item 402(a) and (b) and NG-2012

Item 46A(1) and (2), violates the liability principles established in the Carmack

Amendment and is therefore contrary to law.  The court permanently **ENJOINS** the

government from including or enforcing the above-described freight refund provisions in

the bills of lading subject to the solicitations to the extent that they require a TSP to both

pay "full replacement value" under FRV liability, including shipping costs, and at the

same time forgo the collection of freight charges.

The Clerk shall enter judgment in favor of plaintiffs for the declaratory and

injunctive relief described above.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge